**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 23 MAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court dated August 27, |
| | : | 2021 at No. 1287 MDA 2020 |
| v. | : | Vacating the Judgment of Sentence |
| | : | of the Sullivan County Court of |
| | : | Common Pleas, Criminal Division, |
| ZACHARY CLAYTON CAPRIOTTI, | : | dated September 1, 2020 at No. |
| | : | CP-57-CR-0000021-2019 and |
| Appellant | : | Remanding. |
| | : | |
| | : | ARGUED: November 30, 2022 |

## DISSENTING STATEMENT

**JUSTICE WECHT**                                                **FILED: January 10, 2023**

Pennsylvania Rule of Appellate Procedure 1114 limits to seven "special and important reasons" the grounds upon which this Court may grant a discretionary appeal. Perhaps the first among equals is a novel "question . . . of first impression."[1] When such a question is of "substantial public importance," the argument for granting review is only strengthened.[2] Among the most pressing of such novel questions are those that implicate individual constitutional rights, such as those enshrined in the Fourth Amendment to the United States Constitution.[3] And no Fourth Amendment protection is more important,

---

[1] *See* Pa.R.A.P. 1114(b)(3).

[2] *See* Pa.R.A.P. 1114(b)(4).

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall (continued…)

more central to that provision's animating principles, than its protection of the privacy of one's home.[4] This is true whether the home in question is owned by its resident or rented on a short or long-term basis. It extends in some circumstances even to overnight guests and others who occupy a residence without paying for the privilege. Correlatively, once an owner leases or otherwise commits a residence to another, he or she has only diminished authority to enter the residence, and only for certain purposes.[5]

For the first time in Pennsylvania that I have found, the Superior Court has ruled that police may enter a private residence at a landlord's invitation, even when there is no reasonable basis to conclude that the landlord has authority to extend the invitation, and even when there is ample opportunity for law enforcement personnel to secure the

---

issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[4]     "The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980); *see Mincey v. Arizona*, 437 U.S. 385, 391 (1978) ("It is one thing to say that one who is legally taken into police custody has a lessened right of privacy in his person. . . . It is quite another to argue that he also has a lessened right of privacy in his entire house."); *cf. Commonwealth v. Brion*, 652 A.2d 287, 287 (Pa. 1994) (observing in connection with Article I, Section 8, of the Pennsylvania Constitution that, "[f]or the right to privacy to mean anything, it must guarantee privacy to an individual in his own home").

[5]     *See Commonwealth v. Davis*, 743 A.2d 946, 951 (Pa. Super. 1999) (noting that "common authority" to consent to a police search "is not implied by a mere property interest such as that of a landlord, and "a landlord cannot consent to a search of a tenant's premises, regardless of the lessor's right to enter and inspect"); *see also Chapman v. United States*, 365 U.S. 610 (1961) (finding a Fourth Amendment violation where a landlord forcibly entered an apartment with a police officer in the name of investigating the apartment for waste but in fact searching for evidence of an illegal distillery operation).

premises and procure a search warrant.[6]  This ruling, unsupported by any controlling Pennsylvania decision, threatens the rights of every Pennsylvanian who has a reasonable expectation of privacy in a home he or she doesn't own.  Thus, we granted review for manifestly sound reasons.  Nonetheless, a majority of this Court now has elected to dismiss this appeal as improvidently granted.  I cannot agree.  I would do what we said we would, what we asked the parties to assist us in doing, and what those parties had every reason to expect us to do.  I would review the Superior Court's decision.  Having concluded such review, I would reverse that decision.

When Zachary Capriotti was released from prison on parole in 2014, he did so pursuant to a home plan in which he moved into an apartment owned by his parents, Arlene and Enrico Capriotti.  He remained there for the approximately five years that preceded the events of February 17, 2019, which underlie this appeal.[7]  The apartment

---

[6]    *See Taylor v. United States*, 286 U.S. 1, 6 (1932) (preferring the securing of a search warrant where "there was no probability of material change in the situation during the time necessary to secure such warrant," and where "a short period of watching would have prevented any such possibility").

[7]    The following account of the facts is not only consistent with the suppression record underlying this appeal; our scope and standard of review *compels it*.  Our review of an order denying a motion to suppress evidence reaches both the factual findings and legal conclusions of the suppression court, which, it bears notice, the suppression court is obligated to provide, an obligation the suppression court in this case only minimally complied with in light of the volume of relevant evidence.  *See* Pa.R.Crim.P. 581(I) ("At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights . . . and shall make an order granting or denying the relief sought.").  We review the suppression court's legal conclusions *de novo*.  We are bound to its findings of fact, but only to the extent that the suppression record supports them.  *See Commonwealth v. Millner*, 888 A.2d 680, 685 (Pa. 2005).  "When the suppression court's specific factual findings are unannounced, or there is a gap in the findings, the appellate court should consider only the evidence of the prevailing suppression party . . . and the evidence of the other party . . . that, when read in the context of the entire record, remains uncontradicted."  *Id*.; *accord In re L.J.*, 79 A.3d 1073, 1080 (Pa. 2013); *Commonwealth v.* (continued…)

sits above and in the same building as a restaurant that Capriotti's parents owned. Pursuant to a clearly defined oral agreement, in return for his occupancy of the apartment and management of the restaurant, Capriotti agreed to pay the entire monthly mortgage payment of $1,113, as well as all property taxes, property insurance, and utilities.[8] Capriotti met his obligations until, at most, three months before February 17.

Once Capriotti breached aspects of the agreement, his relations with his parents frayed. Having been forced to cover certain payments that Capriotti had missed,[9] his parents informed him that his management of the restaurant and occupancy of the apartment must end.[10] Accordingly, Enrico changed the locks to the restaurant. Enrico

---

*Shaffer*, 209 A.3d 957, 968-69 (Pa. 2019). Commensurately, we will not "comb through the record to find evidence favorable to a particular ruling. Rather, appellate courts look to the specific findings of fact made by the suppression court." *In re L.J.*, 79 A.3d at 1085. Here, as the following account makes clear, the suppression court's few specific findings of fact that are relevant to the legal question when properly framed lack any support in the record and, indeed, are contradicted by undisputed evidence elicited from witnesses by both the Commonwealth and Capriotti. Accordingly, this account relies upon the Commonwealth's evidence as prevailing party and the uncontradicted evidence Capriotti offered in favor of suppression. As a practical matter, these by and large are one and the same. Setting aside the occasional witness opinion regarding legal matters, the suppression record reveals no important disputes of material fact.

[8] When asked whether Capriotti's "money for rent was $1,113.00 a month," Arlene answered "yes," acknowledging that the money went to the mortgage and was supplemented by Capriotti's payment of the taxes and other bills mentioned above. Notes of Testimony Suppression Hearing, 6/25/2019 ("N.T.") at 39, *see id*. at 11 ("He had to pay the mortgage and pay the bills that were incurred in that building," including utilities, insurance, and the mortgage.). Arlene also acknowledged that, when she and Enrico did formally file for eviction on February 22, 2019, they requested $2,376 as "monthly rent" on their complaint. *Id*. at 43.

[9] Arlene testified that Capriotti was in default as to some, but not all, of his obligations during the few months before February 17. *Id*. at 14-15.

[10] According to Arlene, Enrico had been heard to say "you have to pay to stay, and if you can't pay, you can't stay." *Id*. at 60.

did not change the locks to the apartment, and Capriotti continued to live there. As of February 17, Capriotti and his parents mutually understood that, because Capriotti could no longer honor his end of the bargain, he would remove his personal property and vacate the apartment within a two-week period. That period had not yet expired when the search in this case occurred.[11]

After Enrico changed the locks to the restaurant, Capriotti insisted that certain items of his remained inside. Capriotti demanded that he be allowed to retrieve those items. On February 17, 2019, Capriotti entered the restaurant for that purpose. While inside, his aggressive, erratic behavior—including brandishing a holstered firearm that his felon status precluded him from possessing—prompted Arlene to call the Pennsylvania State Police. Three state troopers responded, including Trooper Curtis Benjamin. When the troopers arrived, they found Capriotti outside the restaurant. He no longer had a firearm in his possession.

The troopers spoke separately to Capriotti and his parents. Enrico informed Trooper Benjamin that Capriotti had indicated that there were firearms hidden inside a wall in the restaurant kitchen. Enrico then cut open the wall on his own initiative, revealing two long guns. Trooper Benjamin took possession of those guns. Aware of Capriotti's parole status, the troopers contacted state parole officials, who issued a permanent detainer. On that basis, the troopers took Capriotti into custody. Even though this eliminated any risk that Capriotti would return to the apartment in the immediate future, Trooper Benjamin conducted a safety sweep of the apartment—in part because

---

[11]    *See id*. at 17-18.

Capriotti's minor son was on the premises[12]—and found no additional weapons or contraband.

After the troopers departed with Capriotti in custody, Enrico searched the apartment, both because Capriotti apparently had left two propane heaters on a setting so high that the walls of the apartment were discolored and because of alleged concern for Capriotti's son's safety. During his search, Enrico saw two handguns and what appeared to be narcotics high on a ledge above the interior of a closet door in the room that Capriotti's son occupied when he visited. Rather than remove these items, Enrico again summoned Trooper Benjamin. When Trooper Benjamin arrived, Enrico escorted him into the apartment, and Trooper Benjamin entered the closet and took possession of two handguns and suspicious substances that later tested as methamphetamine and marijuana.

Trooper Benjamin ultimately filed charges against Capriotti for each of the four firearms recovered, as well as possession with intent to deliver and simple possession relative to the recovered narcotics, and endangering the welfare of a child. Capriotti filed pretrial motions seeking to suppress all of the evidence recovered from the property. Capriotti contested the constitutionality of Trooper Benjamin's entry into the apartment,

---

[12] Capriotti had custody or visitation rights with his minor son during alternating weekends, and the boy was present on the day in question. No one testified that Capriotti's son was in the apartment on February 17, or that there was any reason that the son would enter the apartment if Enrico chose to deny him access out of concern for his safety, or that the same result could not have been effectuated by the troopers themselves by securing the apartment until they could obtain a search warrant, a warrant that it seems clear would have been available, based on the above-described events.

and sought suppression of the items found inside.[13]  Capriotti contended that "the evidence obtained by the State Police must be suppressed . . . as fruits of an illegal search (*i.e.* no warrant, no probable cause, no exigent circumstances, no authority to be inside the building)."[14]  Capriotti asserted that the above-described oral agreement extended over a period of years.[15]  He acknowledged that he "fell behind a few months" before February 2019, but he added that "no formal eviction proceedings were initiated that would prevent him from having . . . [a] possessory interest in the property."[16]  Capriotti asserted that "Enrico had no right to search the upstairs apartment where [Capriotti] resided," where Capriotti "was sleeping and living" as of "that very day."[17]

Enrico's and Trooper Benjamin's rights (or lack thereof) to be in the apartment were the focus of Capriotti's motion.  Hence, the nature of Capriotti's occupancy and satisfaction of the parties' long-standing agreement were front and center during the hearing.  Each of the four witnesses addressed these issues.  This was especially so during the lengthier testimony of Arlene and Trooper Benjamin.  The testimony in its totality revealed no dispute that the parties' long-standing agreement provided for

---

[13]     In addition, Capriotti filed other restaurant-related challenges irrelevant to this appeal.

[14]     Capriotti's Motion to Suppress at 2 ¶10.

[15]     *See id*. at 2 ¶ 12.  Capriotti's assertion that the arrangement had continued for seven years is plainly incorrect.  But the record conclusively establishes that the agreement had been in place for four to five years without interruption.

[16]     *Id*. at 2 ¶ 11.

[17]     *Id*. at 2 ¶ 22.

Capriotti to live in the apartment and to assume the full cost of owning, financing, and maintaining the entire building, including the residence.[18]

Once Capriotti began to default on certain payments toward the end of 2018, his parents relieved him of his restaurant duties and set a date by which he was required to vacate the apartment. Critically, as of February 17, that date had not yet arrived. Indeed, it was five days later, on February 22, 2019, that Enrico and Arlene filed their first formal complaint seeking Capriotti's eviction, an odd measure if they believed, as the Commonwealth does, that Capriotti's occupancy was a matter of "grace" subject to rescission at will.[19]

Arlene's testimony conclusively contradicted any suggestion by the Commonwealth (or finding by the suppression court) that Capriotti did not continue to occupy the property right up to February 17, 2019:

> Q. So when you two come over to go through the restaurant [on February 17, 2019,] *Zachary comes from upstairs, does he not, from his apartment? Zachary had been staying in his apartment upstairs, correct*?
>
> A. *Yes.*
>
> Q. He was occupying that, and I think his cousin or nephew was there.

---

[18] In exchange for his occupancy, Capriotti "had to pay the mortgage and pay the bills that were incurred in that building." N.T. at 11; *cf. id.* at 10 ("[W]e allowed him to run the restaurant and to live upstairs so he would have a place to stay and a job.")

[19] Unintuitively, and inconsistently with the law of residential leases, the Commonwealth contends that, "[c]ontrary to [Capriotti's] brief, [he] was not a tenant but was simply permitted to reside at the apartment with the grace of the owner provided he comply with certain conditions," which conditions of course included the comprehensive payment of all, or nearly all, of the costs associated with the entire building. Cmwlth.'s Brf. at 16. As set forth below, this contention, even if true as a matter of law, would not materially change the Fourth Amendment analysis, which confers its protections based not upon the legal relationship of the party protected but upon occupancy and the reasonable expectation of privacy that attaches to it.

A. Yes.

* * * *

Q. And you knew he was occupying the upstairs apartment at that point?

A. Yes.[20]

To the same effect, when Capriotti's counsel asked whether, "prior to this incident downstairs, [Capriotti] still lived upstairs, still slept upstairs, still used the upstairs as his residence," Arlene answered "Yes."[21] In summary, while Arlene denied the existence of the lease, she testified that Capriotti had lived in the apartment for more than four years and right up to February 17. Indeed, she further testified that Capriotti's cousin had been staying (and was staying) with him in the apartment as of that date.[22]

Trooper Benjamin's testimony also confounded the Commonwealth's account as well as aspects of the suppression court's brief account and analysis. Shortly after his arrival, Trooper Benjamin explained, he talked to Capriotti. Then he went inside to talk to Enrico and Arlene, leaving Capriotti in the company of the two other troopers:

Q. [D]o you know if he remained where he was when you later arrested him?

A. I did not later arrest him, but he was located by the two other troopers in the upstairs apartment.

Q. He was in the upstairs apartment?

A. Yes.

Q. Did you know him to live in that upstairs apartment?

---

[20]   N.T. at 44 (emphasis added).

[21]   *Id*. at 54.

[22]   *Id*. at 45; *see Commonwealth v. Capriotti*, 1287 MDA 2020, 2021 WL 3836846, at *2 (Pa. Super Aug. 27, 2021) (memorandum).

A. I did not. I had never been in the apartment. I had no idea what it was.

Q. Did the parents tell you he lived in the upstairs apartment?

A. Yes.[23]

Arlene's and Trooper Benjamin's testimony firmly established, at a minimum, that all parties understood that Capriotti was a long-time and present occupant as of February 17, albeit one expected to leave soon. It also establishes that Trooper Benjamin understood at least that much of the circumstance, and had no contrary evidence based upon which he might reasonably conclude otherwise. Indeed, the testimony confirms the existence of long-standing agreement in the nature of a lease. Nothing in the record suggests that Trooper Benjamin was unclear regarding the fact of Capriotti's current occupancy. And to the extent that the lower courts and the Commonwealth have suggested or declared at various times that the sum of the evidence establishes that Trooper Benjamin's second entry at Enrico's behest was justified by exigent circumstances,[24] nothing in the record, including especially Trooper Benjamin's own account, suggests any such thing.

With no meaningful discussion of the above undisputed testimony, the suppression court denied Capriotti's motion. The court alluded to Capriotti's alleged abandonment of the apartment in passing, notwithstanding that the Commonwealth provided no evidence whatsoever to substantiate the claim, while the above-recited evidence patently

---

[23]     N.T. at 77-78.

[24]     The suppression court's opinion makes no such finding.

contradicted that conclusion.[25]   Similarly, the court stated that, "[a]t the time, date and place in question, Defendant had no vested right, title, interest or possession of the said premises."[26]   But the court made no effort to tie this legal conclusion to the suppression testimony or to any supporting case law.   Furthermore, the court did not acknowledge that, as explained below, it is Capriotti's subjective expectation of privacy, not his precise legal relationship to the property, that must guide a court in assessing his Fourth Amendment right to be free from an unreasonable search.[27]   Thus, even if the court had correctly concluded that Capriotti's years of timely, consistent, and substantial payments in return for his right to live in the apartment did not demonstrate an arrangement legally indistinguishable from a lease, his lack of right, title, or interest in the property did not vitiate his reasonable expectation of privacy, which requires less than formal tenancy and must be assessed practically rather than in the abstract.

In any event, stripped of its erroneous assertions regarding Capriotti's legal relationship to the property and alleged abandonment, the suppression court's discussion

---

[25]   *See* Suppression Court Opinion, 11/30/2020 ("Supp. Ct. Op."), at 5 ("Defendant vacated the apartment approximately one (1) week prior to the incident.").   The court's basis for this conclusion is unclear.  While the Commonwealth made a bald assertion to that effect in its response to Capriotti's suppression motion, no testimony from any witness provided any support for that conclusion—and indeed the suppression record in its totality, including that of Trooper Benjamin concerning his own understanding of the situation, provides *only* support for the conclusion that everyone involved understood that Capriotti's occupancy had continued right up to the moment of the incident.

[26]   *Id*.

[27]   *See Commonwealth v. Evans*, 410 A.2d 1213, 1215 (Pa. 1979) (holding that the overnight guest of a tenant had a reasonable expectation of privacy in the apartment).

focused upon the silver platter exception to the warrant requirement,[28] which I discuss in more detail below. To establish grounds for a Fourth Amendment claim, the subject of the search first must establish that he had a subjective expectation of privacy in the place or thing that was searched. If he had such an expectation, he must then demonstrate that the privacy interest in question was "societally sanctioned as reasonable and justifiable in the place invaded."[29] We have also observed that a court must "consider the totality of the circumstances and carefully weigh the societal interests involved when determining the legitimacy of such an expectation."[30] In *Commonwealth v. Carlton*, notably, this Court found that two defendants asserted a privacy interest in the premises searched simply because, in one case, the police found identification in the house indicating that the defendant used it as his address, and, in the other, because the subject

---

[28] Supp. Ct. Op. at 5-6. This discussion comprises only four sentences and citations to three cases, none of which materially informs this case in light of those cases' distinguishing features. *See Commonwealth v. Borecky*, 419 A.2d 753 (Pa. Super. 1980) (rejecting a warrant obtained by a police officer based upon marijuana obtained from a confidential informant who seized it during an illegal private search that the police officer was aware of and condoned); *Commonwealth v. Kozak*, 336 A.2d 387 (Pa. Super. 1975) (finding no Fourth Amendment violation where an airline employee opened a misplaced suitcase to identify the owner, observed contraband, and invited police to take possession of the contraband). The suppression court also cited *United States v. Capra*, in which the court observed (in an alternative basis footnote) that, "when police are merely assisting a private party, who has authority to search and a legitimate need to do so, courts are reluctant to exclude resulting evidence." 501 F.2d 267, 272 n.4 (2d Cir. 1974) (internal citation omitted). The private search at issue in *Capra*, much like the one in *Kozak*, involved the opening of a suitcase voluntarily relinquished, and as in *Kozak*, involved a legitimate purpose for the private search—in *Capra*, based upon a reasonable concern that the luggage might contain a dangerous item. Of these, only *Borecky* involved a residence, and that case resulted in suppression.

[29] *Commonwealth v. Carlton*, 701 A.2d 143, 145 (Pa. 1997).

[30] *Commonwealth v. Gordon*, 683 A.2d 253, 257 (Pa. 1996) (citing *Commonwealth v. Peterson*, 636 A.2d 615, 619 (Pa. 1993)).

was present at the time of the search and received mail at that address. In neither case were the subtleties of the legal relationship between the individuals and the premises of dispositive concern.[31]

These principles contradict the suppression court's and the Commonwealth's insistence that Enrico—and Trooper Benjamin vicariously—were free to come and go as they chose simply because Capriotti lacked the benefit of a formal, written lease, did not pay rent directly to his parents as landlords, and/or because his parents happened to be the people who owned the property and allegedly were motivated to allow him to stay out of the goodness of their hearts (provided he also pay well over $1,000 per month of consideration).[32] Even if the evidence sustained that conclusion, and it does not, his long-standing and continuous occupancy of the apartment suffices without more to establish a reasonable expectation of privacy, as established by reams of case law.[33]

---

[31]     *See Carlton*, 701 A.2d at 145-46.

[32]     I do not question Capriotti's parents' motives, either at the outset of the agreement or later, as they sought to address the situation when the relationship soured. I merely note that what the Commonwealth casually refers to as occupancy by "grace" was not, as the word suggests, gratuitous, but rather came with a price tag.

[33]     *See Commonwealth v. Strickland*, 326 A.2d 379, 382 (Pa. 1974) (citing among others *Katz v. United States*, 389 U.S. 347 (1967), for the proposition that the Fourth Amendment protections attach wherever the individual may harbor a reasonable expectation of privacy, and that the lower court erred in denying that protection on the conclusory basis of distinguishing the subject of the search as a "temporary guest" rather than a "resident"); *Carlton*, 701 A.2d at 146 (finding a reasonable expectation of privacy in a residence when the defendant was present at the time of police entry and police knew that he received mail at the address in question); *Commonwealth v. Brundidge*, 620 A.2d 1115, 1118 (Pa. 1993) (finding a paying guest's legitimate expectation of privacy in a motel room); *Evans*, 410 A.2d at 1215 (concluding that an overnight guest of a tenant had a reasonable expectation of privacy); *Commonwealth v. Davis*, 743 A.2d 946, 950 (Pa. Super. 1999) ("Even though appellant was not the named lessee of the premises on the lease, we find the evidence of record demonstrates appellant had a legitimate (continued…)

Along with exigent circumstances and other narrow exceptions to the warrant requirement, courts have recognized a private search or silver platter exception. The silver platter exception has been understood for at least a century to apply when a private party, absent any prodding, inducement, or involvement by law enforcement, obtains contraband from a protected location and delivers it to law enforcement officials.[34]

The case law on the doctrine seldom involves entry into residences. Typically, it involves either actual delivery to the police of evidence illegally obtained or searches of things rather than places. But here, Trooper Benjamin was delivered to the evidence rather than vice-versa, which brings him into direct conflict with the Fourth Amendment's solicitude for the sanctity of the home. Our most recent private search decision, *Commonwealth v. Shaffer*, by way of contrasting example, involved a police search of a customer's laptop at the invitation of a service technician who had discovered suspected

---

expectation of privacy in the premises" because he carried a key to the apartment and his various belongings were inside the apartment).

[34] *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) (recognizing that the Fourth Amendment "secure[d] the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued," but only against "the activities of a sovereign authority," such that where, as in that case, agents of a corporation in control of an office space once occupied by the party seeking suppression ransacked the party's office after his employment termination and delivered certain papers to the Department of Justice, the department was free to use those papers as evidence); *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) ("Had Mrs. Coolidge, wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence."); *Commonwealth v. Harris*, 817 A.2d 1033 (Pa. 2002) (declining to suppress photocopies of letters defendant sent from prison to a private party, who provided them to another private party, who in turn provided photocopies of the letters to the Commonwealth).

child pornography during the technician's own examination of the device.[35]  And the oft-cited United States Supreme Court silver platter case upon which we relied there, *United States v. Jacobsen*,[36] similarly involved a police search of a package the illegal contents of which first had been discovered by Federal Express workers when the package was torn open during processing.

In *Jacobsen*, the Court emphasized that the Fourth Amendment restricts only government action, and "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'"[37]  The Court also acknowledged that, in principle, "[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable."[38]  In *Jacobsen*, however, the initial intrusion into the package was made by the shipper's employees, and the Court held that a subsequent official intrusion along the lines of the private intrusion was not *per se* constitutionally impermissible.  Rather, the police action must be "appraised on the basis of the facts as they existed at the time that [the] invasion occurred."[39]  According to the *Jacobsen* Court, these "facts" necessarily included the

---

[35]     *Shaffer*, 209 A.3d at 972.

[36]     466 U.S. 109 (1984).

[37]     *Id*. at 113 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).

[38]     *Id*. at 114.

[39]     *Id*. at 115.

scope and reasonableness of the suspect's expectation of privacy in the wake of the private search. Consequently, the government's intrusion was to be measured by "the degree to which they exceeded the scope of the private search," a conclusion that this Court echoed in *Shaffer*.[40] The *Jacobsen* Court derived this principle from *Walter v. United States*, in which a private party obtained packages of 8mm films that were decorated on one side by drawings suggestive of homosexual activities and on the other by explicit descriptions of the contents.[41] The FBI's decision to project and view the films without a warrant was deemed unconstitutional, which established that even a modest departure beyond the scope of the private search violated the Fourth Amendment's warrant requirement.[42]

Justice White concurred in *Jacobsen*, expressing an important objection that is of particular relevance to this case. He would have reached the same result as the majority on the basis that, according to the magistrate, when the first DEA agent arrived on the scene the tube that the torn box revealed was in plain view and bags of white powder were visible from the end of that tube. Thus, no official search was required at all—merely having been summoned to the scene provided the agent with a view sufficient to establish suspicion of criminality. But Justice White perceived the majority as relying upon a

---

[40] *Id*.; *see Shaffer*, 209 A.3d at 282 ("Pursuant to *Jacobsen*, our inquiry is two-fold: (1) whether the facts presented establish that a private search was conducted; and, if so, (2) whether the police actions exceeded the scope of the private search.").

[41] 447 U.S. 649, 651-52 (1980),

[42] The *Jacobsen* Court noted the lack of a consensus opinion in *Walter*, but described this analysis as consistent with what a majority of Justices agreed comprised "the appropriate analysis of a governmental search which follows on the heels of a private one." *Jacobsen*, 466 U.S. at 115.

different reading of the record, holding that, even if the suspicious bags were not visible without partially unpacking the contents of the package in the fashion of the original private search, no violation occurred because the agent learned nothing that the private shipper had not already discerned from its own search. Justice White's detailed, well-reasoned objections to the ruling make for compelling reading, but do not warrant reproduction here at length. Sufficient here is Justice White's conclusion that, under the majority's approach, "[i]f a private party breaks into a locked suitcase, a locked car, or even a locked house, observes incriminating information, returns the object of his search to its prior locked condition, and then reports his findings to the police, the majority apparently would allow the police to duplicate the prior search on the ground that the private search vitiated the owner's expectation of privacy."[43] Relatedly, Justice White endorsed the view, which he attributed to Justice Stevens, that such a principle would require diminishing a person's subjective expectation of privacy based upon "subsequent events of which he was unaware," an illogical proposition if the question of the subject's expectation was, in fact, subjective.[44]

What I find important, though, is not Justice White's concern with the broad account of the degree to which police officers may follow a private party in what was, in the first instance, an illegal search, but rather the High Court's casual rejection of Justice White's concerns. The Court explained that, had police merely learned from a private party that a container held contraband, an unwarranted search would not be justified. But

---

[43]     *Id*. at 132 (White, J., concurring).

[44]     *Id*. (quoting *Walter*, 447 U.S. at 659 n.12 (Stevens, J., opinion announcing the judgment of the Court)).

in *Jacobsen*, the employees had already breached the package and observed the items directly, thereby eliminating the defendant's expectation of privacy—an expectation that would remain in the case of a mere report.[45]  In truth, I find this response at best unpersuasive, and arguably non-responsive to Justice White's objection.  But I take from the exchange something like a consensus, however dubiously reasoned, that intrusions into the home upon mere reports of contraband remained in the Court's view impermissible following *Jacobsen*.[46]

The silver platter doctrine rests upon the core principle that courts should not impute the private party's illegal conduct to police officers when the officers are unequivocally blameless as to the illegal conduct.  And it is delivery that most clearly

---

[45]    *Id*. at 121 n.17.

[46]    *Amici curiae*, the American Civil Liberties Union of Pennsylvania and the Public Defender Association of Pennsylvania, dedicate an entire subsection of their brief to jurisdictions that decline entirely to apply the silver platter doctrine to authorize unwarranted entries into homes, noting as well that most of these jurisdictions decline entirely to apply *Jacobsen* in that context.  *See* Brf. for the ACLU of Pa., *et al*., at 14-21 (citing and/or discussing, in order, *United States v. Allen*, 106 F.3d 695 (6th Cir. 1997) (declining to apply silver platter doctrine where police searched motel room for fifteen seconds and withdrew to obtain a warrant based upon the motel manager's prior intrusion and observations, but upholding the search on other grounds); *United States v. Williams*, 354 F.3d 497 (6th Cir. 2003) (approving *Allen*'s refusal to apply *Jacobsen* principles to a private residence); *United States v. Young*, 573 F.3d 711, 720 (9th Cir. 2009) (declining to apply *Jacobsen* to private residences, noting that the hotel room there at issue did not contain only contraband, like the package in *Jacobsen*); *United States v. Paige*, 136 F.3d 1012, 1020, n.11 (5th Cir. 1998) ("[W]e agree with the *Allen* court's decision not to extend *Jacobsen*'s holding to cases involving private searches of residences."); *State v. Wright*, 114 A.3d 340 (N.J. 2015) (holding that the diminished expectation of privacy of tenants relative to landlords, who may have legitimate non-investigatory reasons to enter an apartment, does not extend to police in a case where the landlord during a legitimate entry observed contraband, summoned police, and invited them into the apartment); *People v. Brewer*, 690 P.2d 860 (Colo. 1984); *State v. Johnson*, 716 P.2d 1288 (Id. 1986); *State v. Miggler*, 419 N.W.2d 81 (Minn. Ct. App. 1988); *State v. Eisfeldt*, 185 P.3d 580 (Wash. 2008); *State v. Rodriguez*, 521 S.W.3d 1 (Tex. Crim. App. 2017)).

relieves a police officer of the taint of any illegality associated with obtaining the evidence delivered. Once the officer crosses the threshold of a residence, whether to replicate or to expand upon a warrantless search based on what he knew or had good reason to know was an illegal private entry, the circumstance is categorically different. Trooper Benjamin had good cause (a) to doubt Enrico's authority to have conducted a probing search of private areas of the apartment in the first instance and (b) to doubt that Enrico had authority to invite anyone else into the apartment.

Even if there was some basis to infer that the search was legal from Enrico's first entry on to the second, the evidence certainly did not compel that conclusion, and the lower courts' analyses are incompatible with it. Notwithstanding a digression regarding Capriotti's legal status vis-à-vis the apartment as a matter of property law, the suppression court unequivocally ruled that it was the silver platter doctrine that excused Trooper Benjamin's entry into the apartment and retrieval of the contraband. It makes no sense to apply that doctrine if neither Enrico's first entry and search nor his invitation to Trooper Benjamin to enter was illegal. If Enrico had the right himself to search the apartment and authority to invite Trooper Benjamin into the apartment, there could be no resort to the silver platter doctrine, a theory which exists solely to exonerate police from the taint of private illegality.

The Superior Court affirmed the suppression court's ruling by reference to the silver platter doctrine, rendering its analysis, too, compatible only with the assumption that Enrico's entry was illegal, leaving only the question whether the circumstances relieved Trooper Benjamin of the taint of that illegality. At least in the Superior Court's case, its basis for pursuing that doctrine was evident from its own recitation of the facts.

Acknowledging the only conclusion the suppression record allowed, the Superior Court noted the "oral agreement" establishing the bargained-for exchange pursuant to which Capriotti's long-standing occupancy was established,[47] and effectively acknowledged Capriotti's present occupancy as of February 17, 2019, observing, for example, on February 17, 2019, "Capriotti's cousin . . . was also visiting and staying with Capriotti in the apartment."[48]  Thus, we need not infer solely by its deployment of the silver platter doctrine that the Superior Court believed Enrico's entry to be illegal; we may do so based upon the court's recognition that Capriotti occupied the apartment, which entitled him to the constitutional protections that come with that status.

Reinforcing this inference, the Superior Court acknowledged that "[t]he protection of the Fourth Amendment does not depend on a property right in the invaded place but does depend on whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."[49]   Nevertheless, the court concluded that the suppression court correctly applied the silver platter doctrine because—and, evidently, only because—"the trooper had not told [Enrico] to search there

---

[47]  *Capriotti*, 2021 WL 3836846, at *1.

[48]  *Id*. at 4; *see* N.T. at 45.  As noted earlier, it was during this line of questioning that Arlene testified that the events of February 17 were immediately preceded by Capriotti coming downstairs from the apartment, and she also testified more simply that he continued to occupy the apartment.  N.T. at 44-45.

[49]  *Capriotti*, 2021 WL 3836846, at **5-6 (quoting *Commonwealth v. Rathfon*, 705 A,2d 448 (Pa. Super. 1997)).

and did not assist with the search, merely retrieving the weapons at Enrico's request upon arriving at the scene."[50]

Arlene's testimony conclusively establishes Capriotti's occupancy, and, in fact, his tenancy as such.[51]   And Trooper Benjamin's testimony reflects his understanding on February 17 that Capriotti lived in the apartment.  Trooper Benjamin knew or should have

---

[50]   *Id*. at 15.  Judge McLaughlin dissented on the silver platter analysis.  Citing *Borecky*, Judge McLaughlin observed that the silver platter exception cannot apply when police participate in the illegal activities, and she reinforced Capriotti's continuing occupancy with supporting excerpts from Arlene's testimony.  In *Commonwealth v. Newton*, 943 A.2d 278 (Pa. Super. 2007), Judge McLaughlin noted, the Superior Court found that police had violated the Fourth Amendment because they entered a motel room in which they observed drug paraphernalia from outside the threshold, and because they lacked a warrant, consent, or exigent circumstances.  It bears noting that *Newton* embodies the obvious principle that, if merely knowing or strongly suspecting that there was contraband in a constitutionally protected space created an exception to the warrant requirement, that core constitutional protection, interposing a neutral arbiter between suspects' privacy rights and the potential excesses of zealous law enforcement officials, would be critically diminished.

[51]   Any suggestion that Capriotti's lack of legal tenancy ratified Enrico's authority to invite Trooper Benjamin into the apartment is incorrect because it stems from an erroneous view of what a legal tenancy requires.  This Court has explained:

> The relation of landlord and tenant is always created by contract, either express or implied.  It cannot exist without such contract.  The relation arises under a contract for possession of lands in consideration of rent to be paid therefor.  Its existence is not to be presumed merely because it is asserted.  A tenant is one who occupies land or the premises of another in subordination to the other's title, and with his assent, express or implied.  The contract may be in writing or parol.  Although the payment of rent is a usual incident of a tenancy, the reservation thereof is not essential to the creation of the landlord and tenant relation.

*In re Wilson's Estate*, 37 A.2d 709, 710 (Pa. 1944) (cleaned up); *see Jones v. Levin*, 940 A.2d 451, 455 (Pa. Super. 2007); *see also Assouline v. Reynolds*, 219 A.3d 1131, 1139 (Pa. 2019) (identifying as the "essential elements of a landlord tenant relationship [] that the landlord consents to the tenant's possession, that the landlord subordinates his title to that of the tenant, and that the tenant's exclusive possession and control of the property is pursuant to an express or implied contract").

known that Capriotti's continuing occupancy alone entitled him to a reasonable expectation of privacy, triggering the full protection of the Fourth Amendment's warrant requirement.

The two other exceptions to the warrant requirement that have made brief but non-dispositive appearances in the lower court's decisions and the parties' briefs and oral arguments plainly do not apply here. First, abandonment plainly is unsustainable based upon the undisputed evidence presented to the suppression court. As such, if the suppression court in fact concluded otherwise, we neither owe that finding deference nor can we validate it, given the uncontroverted evidence to the contrary. Second, Trooper Benjamin's testimony provided no basis to conclude that exigent circumstances justified his warrantless entry, in Enrico's company or otherwise. Capriotti was in custody with no likelihood of imminent release, and either Trooper Benjamin or Enrico could have secured the apartment against entry by Capriotti's son (or anyone else) while troopers obtained a search warrant. No authority suggests that Capriotti's filial relationship with his father changed the calculus under these circumstances.[52] It is telling that Trooper Benjamin's testimony provides no support for any claim of exigency nor suggests that he perceived otherwise at the time of his entry.[53] Trooper Benjamin lacked any reason not to secure

---

[52]   *Cf. Commonwealth v. Lehnerd*, 273 A.3d 586 (Pa. Super. 2022) (declining to find apparent authority where mother arrived at her son's house and allowed police to enter using her key to the premises).

[53]   Another potential justification for Trooper Benjamin's entry would be Enrico's apparent authority to consent—*i.e.*, if Trooper Benjamin had a reasonable belief that Enrico had authority to consent to a search of the apartment even though Enrico objectively lacked such authority. *See Commonwealth v. Strader*, 931 A.2d 630, 634-35 (Pa. 2007). The Commonwealth makes a brief attempt to offer this argument in the alternative. Cmwlth.'s Brf. at 23-26. Although the question of Enrico's apparent authority was not squarely considered by the lower courts, it, too, would be unsustainable on the (continued…)

the premises and obtain a warrant from a neutral magistrate.  As courts routinely make clear, where securing premises and obtaining a warrant is feasible, that's precisely what should be done.[54]

The dangers presented by the Superior Court's application of the silver platter doctrine in this case, if its logic is followed to its unavoidable conclusion, are manifold. Chief among them is that it is unclear under what circumstance a police officer cannot enter an apartment at the invitation of a landlord or property manager, provided only that the private party avers that he observed contraband in the apartment—even in the absence of authority or exigency, even when the officer has every reason to believe that the occupant has a reasonable expectation of privacy in the residence, and even when circumstances readily furnish the officer the alternative to secure the premises and obtain a warrant.  This turns the warrant requirement on its head.[55]  Such reports are precisely

---

record before us.  Any belief on Trooper Benjamin's part that Enrico had authority to invite him into the apartment without a warrant would be unreasonable as a consequence of the same evidence, undisputedly known to Trooper Benjamin, that undermines abandonment and exigent circumstances.  We must assume that a Pennsylvania State Police Trooper is sufficiently acquainted with the limitations upon a property owner's authority to intrude upon an occupant's privacy if we are to pay more than lip service to the case law that says so.

[54]    *See Taylor*, 286 U.S. at 6 (preferring the securing of a warrant where "there was no probability of material change in the situation during the time necessary to secure such warrant," and where "a short period of watching would have prevented any such possibility"); *see also Chapman*, 365 U.S. at 614 (deploring a warrantless entry where "[n]o reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate").

[55]    *Cf. Chapman*, 365 U.S. at 616-17 (noting that to permit a landlord to forcibly enter an apartment in the company of police nominally to search for "waste" but manifestly to search for illegal distillery equipment "would reduce the (Fourth) Amendment to a nullity and leave (tenants') homes secure only in the discretion of (landlords)").

the sort of evidence that establish probable cause for a search warrant, but they cannot obviate the necessity of obtaining one.

The concern is hardly academic. Merely that Enrico admitted Trooper Benjamin and guided him to the closet does not change the fact that everything following their entry amounted to a search. Trooper Benjamin wasn't blindfolded between the closet and the entry, and his every observation of Capriotti's home and closet—indeed, the mere opportunity to observe—were part and parcel of a broader search, one made more probing by virtue of Trooper Benjamin's professional experience. Put in terms of *Shaffer* and *Walter*, Trooper Benjamin's transit through the apartment and his entry into the closet could only have amounted to an expansion of the scope of Enrico's private search.[56] As

---

[56] In *Paige*, the Court of Appeals aptly highlighted the additional intrusion necessarily involved in police entry of a home, an intrusion that distinguishes residential private search cases from application of the exception to effects like packages:

> [P]eople's homes contain countless personal, non-contraband possessions. Certainly, a homeowner's legitimate and significant privacy expectation in these possessions cannot be entirely frustrated simply because, *ipso facto*, a private party . . . views some of those possessions. Because *Jacobson* was concerned primarily with measuring the scope of a private search of a mail package, the entire contents of which were obvious, we agree with the *Allen* court's decision not to extend *Jacobsen*'s holding to cases involving private searches of residences. A decision any other way would make the government the undeserving recipient of considerable private information of a home's contents strictly through application of an inflexible rule. We refuse to reward the government with such a windfall . . . .

*Paige*, 136 F.3d at 1020 n.11 (cleaned up); *cf. Williams*, 354 F.3d at 510 (noting that even if the distinction between the package in *Jacobsen* and the home crafted in *Allen* to exclude the home from the private search exception did not apply in *Williams*, the initiating private search was exceeded when the officer looked under a sink, where the private party had not looked). Moreover, given Enrico's (and perhaps his grandson's) free access to the apartment during the time that passed between the first search and Trooper Benjamin's entry, there is no way to know whether additional items had been moved or revealed. And to the extent any findings of fact might have spoken to the respective (continued…)

such, it constituted an unequivocal infringement of Capriotti's reasonable expectation of privacy, one that was completely unnecessary under the circumstances.

My substantive concerns with the lower court's ruling on this novel and important issue, informed by the clear suitability of this case for review under Pa.R.A.P. 1114, are the primary source of my disagreement with this Court's decision to forfeit the opportunity to issue a precedential decision on this important issue. My view also is informed by how vividly this case illustrates broader institutional concerns with dismissing cases as improvidently granted, especially when, as here, all of the customary reasons for deciding a discretionary appeal are present and no apparent procedural, evidentiary, or prudential concern militates otherwise.

I cannot ignore the efforts, expectations, and expenses that ensue when we grant allowance of appeal. When we accept discretionary review of a case, we trigger an extensive, time-consuming process involving the investment in time and treasure of numerous people, including parties, attorneys, and supporting staff. Decisions must be made, records reviewed, strategies devised, and briefs drafted and submitted. Then there are the preparations for oral argument, which we admonish attorneys to approach rigorously and with command of their cases and the legal issues at bar. Finally there is oral argument itself, which often requires burdensome travel and the rigors of appearing before us.[57]

---

scopes of the two searches, the suppression court made none, and we are not free to speculate.

[57] We also invite *amicus curiae* briefs, such as those filed on behalf of both sides in this case—the American Civil Liberties Union of Pennsylvania and the Public Defender Association of Pennsylvania in support of Capriotti, and the Pennsylvania District Attorneys Association in support of the Commonwealth. Not infrequently, these briefs are (continued…)

The question presented is novel and consequential. The evidentiary record is more than sufficient to sustain a ruling supported by a framework against which future cases can be measured.  And the issue as to which we granted review, as well as its underlying predicates, have been advocated exhaustively at each level by capable professionals zealously fulfilling their duties to their respective clients.  They deserve substantive consideration.  I don't believe this Court allowed this appeal improvidently.  I respectfully dissent.

Justice Donohue joins this dissenting statement.

---

prepared by attorneys working on a *pro bono* or discounted basis, diverting considerable amounts of time from their paying practices, or by public interest attorneys, who divert their already scarce resources to the task.